1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    LAN YING XIE,                              Case No.  14-cv-02325-JCS

          Plaintiff,
8
                                               **ORDER RE MOTIONS FOR**
9         v.                                   **SUMMARY JUDGMENT**

10   CAROLYN W. COLVIN,                         Re: Dkt. Nos. 17, 20

          Defendant.
11

12

13   I.     **INTRODUCTION**

14          On June 1, 2011, Plaintiff filed an application for disability insurance benefits pursuant to

15   Title II of the Social Security Act.  The claim was denied initially and on reconsideration, and an

16   Administrative Law Judge ("ALJ") convened a hearing on November 27, 2012.  In a decision

17   dated January 7, 2013, the ALJ found that Plaintiff was not disabled prior to her date last insured

18   ("DLI").  The Appeals Council denied Plaintiff's request for review, making the ALJ's decision

19   the final determination of the Commissioner of Social Security ("Commissioner").  Plaintiff

20   timely filed the complaint in this action seeking review of the Commissioner's decision pursuant

21   to 42 U.S.C. § 405(g), which gives the Court jurisdiction to review the final decision of the

22   Commissioner.

23          Presently before the Court are cross motions for summary judgment.  Plaintiff asks the

24   Court to reverse the decision of the Commissioner and award benefits, or alternatively, to remand

25   for further proceedings.  Defendant asks the Court to affirm the Commissioner's decision denying

26   benefits.  The parties have consented to the jurisdiction of the undersigned United States

27   magistrate judge pursuant to 28 U.S.C. § 636(c).  For the reasons stated below, the Court

28   GRANTS Plaintiff's summary judgment motion, DENIES Defendant's summary judgment

United States District Court
Northern District of California

motion, reverses the decision of the ALJ and remands to the Commissioner for further proceedings.

## II.     BACKGROUND

### A.     Personal Background

Ms. Xie was born on March 21, 1951 in China.  Administrative Record ("AR") at 310. She is a mono-lingual Cantonese speaker with at most, two years of education.  AR 190, 205, 244−45, 310, 410.  She was married in 1974 to Mr. Zuo X. Ou.  AR 136.  The couple moved to the United States in 1984 and had four children, all of whom are now adults.  AR 310.  Ms. Xie and her husband were divorced on November 30, 2009.  AR 136.  She currently lives alone in Oakland, California, in a townhouse owned by family members.  AR 324, 464.

### B.     Work History

Ms. Xie was gainfully employed from 1984 to March 1, 2006.  AR 166−67.  From 1992 to 2004, the majority of her working life, Ms. Xie worked in the capacity of a "machinist/sewing," an unskilled job in which she operated sewing machines and lifted and carried plastic parts.  AR 187. This position also required her to stand and walk eight hours a day and to frequently carry weight exceeding fifty pounds.  AR 187, 210.  Ms. Xie worked in this capacity at three separate plastic bag companies during this period.  AR 207.  Additionally, she held positions as a dishwasher at a restaurant for several days in 2004 and as a seamstress at a sewing company for seven months between 2005 and 2006.  AR 207.  In her Function Report − Adult dated August 24, 2007, Ms. Xie states that she was terminated from the plastic bag company, restaurant, and sewing company because of problems getting along with other people, specifically that she did not listen to her bosses and thought their decisions were incorrect.  AR 206; *see also* AR 198 (Ms. Betty Chieng, Ms. Xie's daughter, writes in a Function Report − Adult − Third Party, dated August 28, 2007, that Ms. Xie was fired from the plastic bag company "because of her paranoid behaviors toward others").  In a second Function Report − Adult dated December 18, 2007, Ms. Xie writes that she was terminated from those jobs because of problems getting along with others, particularly because she experienced difficulty understanding at times.  AR 231; *see also* AR 239 (Ms. Chieng writes in a second Function Report − Adult − Third Party, dated December 20, 2007, that Ms. Xie

United States District Court
Northern District of California

was terminated because she was "talking non-sense [sic]" and because of her "paranoid thoughts toward others"). Ms. Xie left her most recent position on March 1, 2006. AR 187. Her Date Last Insured was September 30, 2006. AR 182. In 2011, Ms. Xie reported to several doctors that she was working as a prostitute in order to make ends meet. AR 310, 325, 408, 510. However, on February 28, 2012, Ms. Xie told one of her doctors that she no longer worked in the sex trade. AR 469.

### C.    Medical History

Ms. Xie is an obese, HIV-positive, paranoid schizophrenic with depression, diabetes, chronic dizziness, vertigo, and a latent tuberculosis infection. AR 355, 366−68, 385−87, 391, 444. Ms. Xie has been treated by medical professionals at Asian Health Services, Pathways to Wellness, and Highland Hospital.

### 1.    Asian Health Services Records

Ms. Xie was brought by her son to Asian Health Services ("AHS") on July 28, 2006, and was seen by Dr. Zhi Huang, a family practitioner. AR 355. Ms. Xie complained that someone shot needles into her, that she was not sleeping well, and that she was experiencing dizziness. *Id.* Her son told the doctor that Ms. Xie was having a mental problem (paranoid type), and said that she suspected other people were trying to harm her. *Id.* Dr. Huang diagnosed her with "psychotic symptoms (hallucinations)," and started her on a trial of Haldol. *Id.*

Ms. Xie returned to AHS on October 19, 2006, and was seen by Dr. Fumi Suzuki, a family practitioner. AR 352. Dr. Suzuki diagnosed Ms. Xie with psychosis after she described her auditory hallucinations and paranoia. AR 352−53. Dr. Suzuki's notes state that the psychosis diagnosis was made in July 2006. AR 353. Dr. Suzuki also noted that Ms. Xie's daughter felt that Ms. Xie had been suffering from psychotic symptoms since five years previously, in 2001. *Id.* She was prescribed Haldol for her psychosis, and Dr. Suzuki made a note to refer Ms. Xie to Alameda County Mental Health Services or a psychiatrist "ASAP." AR 352. Dr. Suzuki faxed her referral to Alameda County Mental Health Services on October 23, 2006. AR 353.

Ms. Xie saw Dr. Suzuki again on November 30, 2006. AR 350. Dr. Suzuki's notes indicate a diagnosis of psychosis and hypertension. *Id.* Dr. Suzuki noted that Ms. Xie still "thinks

1  people are after her." *Id.* Ms. Xie's daughter, Betty Chieng, also told Dr. Suzuki that Ms. Xie had

2  not been taking her medicine for either her psychosis or her hypertension. *Id.*

3         Ms. Xie saw family nurse practitioner Jennifer Chiu at AHS on September 28, 2010,

4  complaining of pain while urinating. AR 347. She told the nurse practitioner that she was not

5  seeing a mental health doctor or taking mental health drugs because she is not "crazy." *Id.*

6  However, Ms. Chiu's notes reflect a diagnosis of psychosis, and reported that Ms. Xie became

7  "easily agitated throughout [their] conversation." *Id.* Additionally, Ms. Chiu reported poor

8  medical regimen adherence by Ms. Xie, specifically that Ms. Xie told her that she "never" takes

9  her hypertension medications. AR 346−47. At her follow up appointment on October 7, 2010,

10 another AHS nurse practitioner advised Ms. Xie to take her medications, and to decrease the fat in

11 her diet and to exercise more regularly. AR 344.

12        On January 12, 2011, Ms. Xie visited another AHS family nurse practitioner, Gina

13 Nguyen, complaining of headaches, dizziness, and that the upstairs neighbor did "voodoo" on her.

14 AR 342. Ms. Nguyen's notes indicate a diagnosis of paranoia and psychosis. *Id.* Ms. Xie again

15 denied taking psychiatric medication or seeing a psychiatrist. *Id.* Ms. Nguyen noted that Ms. Xie

16 was not taking her hypertension medications regularly. *Id.*

17        Ms. Xie returned to AHS on March 24, 2011, and was seen by Dr. Christina Ng, a family

18 practitioner. AR 340. Ms. Xie complained that the neighbors upstairs were poking drug-laden

19 needles through the ceiling into her body, causing constipation and difficulty urinating. *Id.* Ms.

20 Xie told Dr. Ng that these drugs were purchased from a black man at the Casino San Pablo. *Id.*

21 Ms. Xie also complained of her head ringing, and explained that she would miss doses of her

22 hypertension medication, and then take four at once. *Id.* Ms. Xie also described hearing voices

23 that threatened to kill her. *Id.* Dr. Ng reported that Ms. Xie continued to deny her mental illness,

24 because she feels that mental illness is taboo. *Id.*

25        On May 31, 2011, in response to a referral by Dr. Christina Ng, AHS conducted an initial

26 behavioral health evaluation on Ms. Xie. AR 310−312. The AHS evaluation report reflects a

27 diagnosis of psychosis and paranoid schizophrenia. AR 310, 312. The report states that Ms. Xie's

28 mental illness began in 2005. AR 310−312. At the evaluation, Ms. Xie described an upstairs

1  tenant putting needles into her head, causing her headaches.  AR 310.  She also described hearing

2  sounds and voices, as well as experiencing dizziness and leg weakness.  AR 310.  The evaluating

3  practitioner described Ms. Xie as experiencing delusions of persecution and presenting with

4  diminished attention and concentration.  AR 311.  The report stated that Ms. Xie lacked family

5  support and was socially isolated.  AR 312.  It also stated that Ms. Xie refused medication and

6  specialty mental health services.  *Id.*

7        Ms. Xie returned to AHS over the next few months for a variety of new as well as ongoing

8  issues.  On August 25, 2011, Ms. Xie was seen by family nurse practitioner Gina Nguyen for

9  "multiple bizarre complaints."  AR 330.  She told Ms. Nguyen that her neighbors were trying to

10  kill her and that there was a "plug" in her cervix.  *Id.*  Ms. Nguyen described Ms. Xie as obese,

11  having poor hygiene, and appearing "confused."  AR 331.  The notes reflect a diagnosis of

12  paranoid schizophrenia.  AR 330.  On September 20, 2011, Ms. Xie was seen by Dr. Sophia

13  Wong, an AHS family practitioner, and was newly diagnosed with HIV.  AR 318.  Dr. Wong gave

14  Ms. Xie "extensive" counseling and education on the importance of taking her HIV medication as

15  prescribed.  *Id.*  The notes indicate her ongoing diagnoses of paranoid schizophrenia and

16  hypertension.  *Id.*  Dr. Wong also noted that Ms. Xie was having social issues.  *Id.*  On October 7,

17  2011, Ms. Xie saw AHS family practitioner Dr. Jenny Riley complaining of cheek and jaw pain.

18  AR 520.  Dr. Riley noted that Ms. Xie had multiple "very decayed" teeth, one of which was loose.

19  *Id.*  Ms. Xie was referred to a dentist on November 8, 2011, but refused an appointment because

20  her "teeth [were] not broken yet."  AR 513.

21        Ms. Xie returned to AHS on November 8, 2011, and was again seen by Dr. Wong.

22  According to Dr. Wong's notes, Ms. Xie was "still having auditory hallucinations, . . . telling her

23  that her body is not healthy."  AR 518.  Ms. Xie reported being hesitant to take her HIV

24  medications due to the size of the pills and her fear of "being unable to swallow" them.  AR 518.

25  Dr. Wong also noted Ms. Xie's poor dentition and periodontal disease.  *Id.*

26        Dr. Wong saw Ms. Xie again on December 6, 2011.  Dr. Wong reported that Ms. Xie was

27  poorly adhering to her prescription plan.  AR 510.  According to Dr. Wong's notes, Ms. Xie has

28  limited medical understanding.  *Id.*  As of that date, Ms. Xie was taking six prescriptions for her

United States District Court
Northern District of California

1   HIV, hypertension, and nerve pain, as well as "Herbal Meds" for general discomfort.  AR 511.

2   Dr. Wong noted that Ms. Xie forgets to take her HIV medications, and that Ms. Xie explained that

3   she occasionally would not take certain of her medications when she took others.  AR 510−511.

4        On December 28, 2011, Ms. Xie saw Dr. Wong after her dizziness caused her to fall off a

5   swing.  AR 504−505.  She sustained hip and upper arm injuries as a result of her fall.  *Id.*

6   According to an October 12, 2012 letter written by Dr. Kerry Kay of AHS, Ms. Xie's chronic

7   dizziness has resulted in several falls.  AR 498.

8        On January 26, 2012, Dr. Wong prepared a Medical Statement at the request of the

9   Alameda County Social Security Agency.  AR 390−92.  Dr. Wong stated that Ms. Xie has been

10  diagnosed with "[s]chizophrenia with paranoid features [and] auditory hallucinations," chronic

11  vertigo, hypertension, HIV, and a latent tuberculosis infection.  AR 391.  She described Ms. Xie's

12  psychotic symptoms as "difficult-to-control," including "commanding auditory hallucinations."

13  *Id.*  Dr. Wong explained that Ms. Xie has difficulty "understanding and adhering to chronic

14  medications, so her chronic conditions in turn are difficult to control and are disabling."  *Id.*  As

15  regards Ms. Xie's ability to work, Dr. Wong said that "she is too disorganized with her psychotic

16  symptoms to . . . conduct work safely."  *Id.*  In particular, the psychosis "makes it difficult for

17  [Ms. Xie] to follow instructions, and her auditory hallucinations make it difficult for her to listen

18  to and understand directions."  AR 392.  Dr. Wong also wrote that Ms. Xie has poor memory

19  recall.  *Id.*  Further, "[h]er vertigo makes it difficult for her to do physical activities."  AR 392.

20  According to Dr. Wong, Ms. Xie retains the capacity to lift and carry under ten pounds for up to

21  one third of an eight-hour workday, stand or walk less than two hours in an eight-hour workday,

22  and sit less than about six hours in an eight-hour workday.  *Id.*

23       On February 28, 2012, Ms. Xie returned to Dr. Wong at AHS and reported hearing static

24  sounds and indistinct voices "like in [the] forest when she worked on [a] farm."  AR 468.  Ms. Xie

25  also told Dr. Wong that the sounds get louder with spicy foods.  *Id.*  In the same visit, however,

26  Ms. Xie "denies auditory hallucinations."  *Id.*  Dr. Wong's notes state that Ms. Xie had not taken

27  her HIV medications for over two weeks.  *Id.*  Ms. Xie told Dr. Wong that the pills are too big and

28  get stuck in her throat.  *Id.*  Dr. Wong reported her fear that HIV resistance might occur with Ms.

United States District Court
Northern District of California

6

United States District Court
Northern District of California

1   Xie's low level of adherence to her medication.  *Id.*

2          Ms. Xie returned to AHS on April 17, 2012, and was seen by Dr. Wong for an "HIV

3   Visit."  AR 456.  According to the HIV Visit Summary, Ms. Xie complained of throbbing head

4   pain that she described as "needle pricks."  *Id.*  Ms. Xie also told Dr. Wong that she was suffering

5   from insomnia, and continued to feel dizzy and hear noises in her head.  AR 456−57.  Dr. Wong

6   reported that Ms. Xie had "poor adherence" to her prescribed medication.  *Id.*  Dr. Wong also

7   referred Ms. Xie to an AHS nutritionist for evaluation and guidance.  *Id.*  Ms. Xie met with Elize

8   Chan, the AHS nutritionist, on May 14, 2012, who encouraged her to reduce the amount of sugar

9   she consumes.  AR 455.

10          Ms. Xie returned to AHS on May 15, 2012 and June 12, 2012 for HIV Visits, and was seen

11   at both appointments by Dr. Wong.  AR 452.  In her May 15, 2012 notes, Dr. Wong reported that

12   Ms. Xie was likely not taking her HIV, hypertension, or psychosis medications as prescribed.  *Id.*

13   According to Dr. Wong's notes, Ms. Xie was taking over-the-counter Chinese caffeine powder for

14   headaches.  AR 453.  Dr. Wong requested that she return in two weeks with her pill bottles.  *Id.*

15   On June 12, 2012, Ms. Xie returned to Dr. Wong, complaining of "always feeling sleepy," often

16   feeling dizzy, and hearing a "ding dong" sound in her head.  AR 448−49.  Despite telling Dr.

17   Wong that she took her medications, Dr. Wong's notes state that "after extensive counseling and

18   adherence checks" Ms. Xie was not taking "virtually any" of her medications for HIV,

19   hypertension, or psychosis.  *Id.*

20          On May 15, 2012, a medical professional at AHS completed a Medical Report −

21   Verification of Physical/Mental Incapacity − General Assistance ("Alameda County Medical

22   Report") for the Alameda County Economic Benefits Department.  AR 496.  According to the

23   AHS medical professional completing the Alameda County Medical Report, Ms. Xie's disability

24   is permanent and does not allow her to do any work.  *Id.*  The Alameda County Medical Report

25   indicates that while Ms. Xie retains partial capacity for continuous sitting and standing, as well as

26   full function of both her hands, she is not capable of performing sedentary or clerical work

27   because she "does not have the mental capacity."  *Id.*

28          On October 30, 2012, Dr. Kerry Kay, a doctor at AHS identifying herself as Ms. Xie's

"treating physician," sent a letter as part of Ms. Xie's application for Social Security Disability Income stating that Ms. Xie has been a clinic patient since 1985 and that her diagnoses have included paranoid schizophrenia since 2001. AR 498. As of the date of the letter, October 30, 2012, Ms. Xie was also diagnosed with hypertension, HIV, chronic dizziness, vertigo, and diabetes. *Id.* According to Dr. Kay, Ms. Xie's main disabilities result from her paranoid schizophrenia and chronic dizziness. *Id.*

### 2. Dr. Tuong Vi Ta Psychiatric Treatment Notes

Ms. Xie began receiving psychiatric treatment from Dr. Tuong Vi Ta on December 20, 2006 for her psychosis. AR 493. Ms. Xie continued to see Dr. Ta until November 1, 2007. *Id.* According to Dr. Ta's psychiatry notes dated December 20, 2006, Ms. Xie's paranoid thoughts about others trying to harm her began approximately five years previously, in 2001, when she was still working at the plastic bag factory. AR 493. Dr. Ta's notes from May 8, 2007 indicate that Ms. Xie "still has paranoid thinking." AR 494. Dr. Ta's notes from July 7, 2007 state that Ms. Xie presented as "withdrawn" and kept her eyes down. On that date, Dr. Ta wrote that Ms. Xie continued to have paranoid thinking and auditory hallucinations in the form of voices whose contents she does not know. *Id.* Dr. Ta's July 7, 2007 notes further state that Ms. Xie reported wearing aluminum on her body as a bullet-proof shield. *Id.* At Ms. Xie's last visit, on November 1, 2011, Dr. Ta reports that Ms. Xie continued to suffer from hallucinations and paranoia. *Id.* Throughout this period, Dr. Ta prescribed Lexapro and Seroquel for Ms. Xie's psychosis. *Id.*

### 3. Function Reports − Adult completed by Claimant

#### a. August 28, 2007 Function Report

On August 28, 2007, Ms. Xie completed a Function Report − Adult ("August 28, 2007 Function Report") for the Social Security Administration with the help of her daughter, Betty Chieng. AR 200−214. In the report, Ms. Xie described her daily activities as remaining at home sitting on her couch, watching TV, looking at her yard, and cooking and eating simple meals. AR 200. She also reported putting "tan can cover" over her body for protection. *Id.* Ms. Xie reported that before her illness, she was able to "go outside [and] go to work," but could not now. AR 201. She used to "like going out to different stores to shop around or window shop[]" before her illness,

United States District Court
Northern District of California

1    and used to watch TV and sleep much less.  AR 204.  She reported that her "pain all over" is

2    caused by "someone . . . harming [her]" and that she cannot sleep as a result.  AR 201.  She also

3    reported problems using the bathroom, because "someone put a needle in [her] stomach."  *Id.*

4      In the August 28, 2007 Function Report, Ms. Xie stated that she relies on her children to

5    take care of her cat and mother-in-law, to help her wash dishes, and that she needs them to remind

6    her to take her medicine and wash her clothes.  AR 201−202.  Ms. Xie stated that her daughter

7    forces her to take her medicine, which she considers to be "poison."  AR 202.  She also relies on

8    her children to handle her finances, as she does not speak any English.  AR 203.

9      Ms. Xie also described in the August 28, 2007 Function Report the ways in which her

10   illness has limited her cognition and social life.  She reported that her illness has affected her

11   ability to walk, sit, talk, remember, concentrate, understand, and get along with others.  AR 205.

12   She stated that she is "always" arguing with her husband, and that since her illness, she cannot

13   make any friends.  *Id.*  Ms. Xie reported fearing people.  AR 206.  She estimated that she can

14   concentrate for one minute and stated that she does not follow written or verbal instructions "too

15   well."  AR 205.  She also reported that she does not handle stress or changes in routine well.  AR

16   206.

17        b.   December 18, 2007 Function Report

18     On December 18, 2007, Ms. Xie completed a second Function Report − Adult ("December

19   18, 2007 Function Report") for the Social Security Administration with the help of her daughter,

20   Betty Chieng.  AR 225−32.

21     Ms. Xie gives substantially the same responses to the Function Report questions in the

22   December 18, 2007 Function Report as she gave in her August 28, 2007 Function Report.  Ms.

23   Xie reiterated that she feels her medicine is "poison" and that her daughter and husband force her

24   to take it.  AR 227.  She also reiterated that she relies on her children's reminders to wash up and

25   to wash her clothes.  *Id.*  Ms. Xie's daughter, Tina, helps her care for her mother-in-law and her

26   cat.  AR 226.  Ms. Xie reported continuing to have difficulty sleeping because she does not feel

27   safe and feels pain all over "because someone [is] sticking [her] with needles."  *Id.*  Ms. Xie also

28   reported continued putting "tin can over [her] body to protect" herself at bedtime.  AR 225.

Ms. Xie described again how she was once able to "interact with others," but her illness has now made it difficult for her to "get along with people" and that she no longer "know[s] how to make friends." AR 226, 230. In particular, Ms. Xie wrote that she continues to have problems getting along with her husband, and that the two of them "always argue about money." AR 230.

### 4. Function Reports − Third Party completed by Ms. Betty Chieng

#### a. August 24, 2007 Third Party Function Report

Ms. Xie's daughter, Betty Chieng, also completed a Function Report − Adult − Third Party for the Social Security Administration dated August 24, 2007 ("August 24, 2007 Third Party Function Report"). AR 192−99. Ms. Chieng's description of Ms. Xie's daily activities aligns closely with that given by Ms. Xie herself, including lying down on the sofa, putting a "tin can cover over her body," cooking and eating simple meals, and watching TV. AR 192. Ms. Chieng stated that her mother wears the tin can cover because she fears being shot, and because she is "always afraid someone will hurt her." *Id.* According to Ms. Chieng, prior to her illness, Ms. Xie was able to care for herself, her children, her mother-in-law, and was able to hold a job. AR 193. Further, prior to her illness, her mother "used to only watch [TV a] couple times a week for short times" and that she "used to like going out shopping for things." AR 196. According to Ms. Chieng, although Ms. Xie's personal hygiene improved since starting her medication, she still needs reminders from family to wash her clothes and take her medication. AR 193−94. Ms. Chieng also stated that her mother requires assistance handling her finances and that when she goes out grocery shopping, she is usually accompanied by a family member. AR 195−96.

As to her mother's cognitive and social abilities, Ms. Chieng reported that Ms. Xie's illness has caused her to be unable to make friends because she can no longer carry out a normal conversation. AR 197. She also reported that Ms. Xie does not get along with her husband. *Id.* Further, Ms. Xie talks about "delusional things," has a hard time concentrating "if distracted by something else," has "poor" understanding and insight, and is "too paranoid to get along with others, without feeling others [are] out to harm her and her family." *Id.* According to Ms. Chieng, Ms. Xie "fears others [are] out to get her money and hurt her family" and "[w]ears tin cans to protect herself." AR 198. Ms. Chieng wrote that Ms. Xie can concentrate for about one minute,

United States District Court
Northern District of California

10

1   and that she does not follow spoken instructions too well.  AR 197.  Ms. Chieng stated that Ms.

2   Xie is "fairly ok" with Chinese words when following written instructions.  *Id.*  She reported that

3   Ms. Xie's ability to get along with authority figures, handle stress, and handle changes in routine

4   is "fair."  AR 198.

5                    b.   December 20, 2007 Third Party Function Report

6           On December 20, 2007, Ms. Chieng completed a second Function Report − Adult − Third

7   Party ("December 20, 2007 Third Party Function Report") for the Social Security Administration.

8   AR 233−40.  Ms. Chieng gave substantially the same responses to the Function Report questions

9   in the December 20, 2007 Third Party Function Report as she gave in her August 24, 2007 Third

10  Party Function Report.  However, she does elaborate on several important points.

11          In particular, Ms. Chieng described Ms. Xie's worsening personal hygiene.  According to

12  Ms. Chieng, "[f]amily members [are] needed to tell [Ms. Xie] to wash up, do her hygiene care

13  more often and change and wash her dirty clothes."  AR 235.  Ms. Chieng wrote that Ms. Xie

14  "don't [sic] go do her morning hygiene" and that she "[n]eeds my sister to remind her to do [it]."

15  AR 233.  Ms. Chieng wrote that Ms. Xie "wears [the] same clothes day to night" and often does

16  not change her clothes for several days at a time.  AR 233−34.  According to Ms. Chieng, Ms. Xie

17  only bathes 2−3 times per month.  AR 234.  Ms. Chieng also explained that Ms. Xie had "severe

18  tooth pain" that caused her face to swell.  *Id.*  Ms. Xie refused, however, to be taken to the dentist

19  on account of her paranoia that people are trying to kill her.  *Id.*  Ms. Xie ended up losing one of

20  her front teeth as a result.  *Id.*

21          Ms. Chieng also described Ms. Xie's resistance to medical treatment.  In particular, Ms.

22  Chieng wrote that Ms. Xie requires "close monitoring to comply with [her] medications."  AR

23  235.  According to Ms. Chieng, Ms. Xie thinks that the medicine is "poison" and says that she

24  forgets to take it, or sometimes, refuses to take it.  *Id.*  Further, Ms. Xie "[n]eeds reminder[s] to see

25  her doctor, once a month" and is sometimes resistant to going.  AR 237.  Ms. Chieng wrote that

26  she has "to take [Ms. Xie] to see Dr. Ta or she will never go."  *Id.*

27          According to Ms. Chieng, Ms. Xie's cognitive and social functioning deteriorated since

28  writing the August 24, 2007 Third Party Function Report.  Ms. Chieng wrote that Ms. Xie's

United States District Court
Northern District of California

11

eyesight, memory, concentration, and task follow-through are worsening.  AR 238.  Ms. Chieng stated that Ms. Xie is talking to herself more, and has become "[m]ore hyper vigilant of people around her."  AR 239.  Further, Ms. Chieng explained that since Ms. Xie's husband's recent car accident, her ability to cope with stress has suffered.  *Id.*  Ms. Chieng also wrote that since the accident, Ms. Xie's paranoid thoughts of people wanting to hurt her and her family have increased. *Id.*  Ms. Xie continued to experience marital tension and is "unable to make friends," because her illness has caused her difficulty "trusting others" and has made her "paranoid and suspicious of others."  AR 238.

### 5.  Pathways to Wellness Records

On December 14, 2011, the Pathways to Wellness Medication Clinic ("PTW") conducted an initial mental state assessment of Ms. Xie.  AR 407−12.  The reason listed for the assessment is "Medication Management for Psychiatric Symptoms."  AR 407.  Dr. Hiawatha Harris, the PTW doctor evaluating Ms. Xie, described her as "somewhat disheveled," "withdrawn depressed," with "impaired" reasoning.  AR 407, 410.  Dr. Harris indicated that Ms. Xie suffers from moderate functional limitation to her daily life, specifically in "maintaining social functioning/ relationships," "maintaining, concentration, persistence of place," and through suffering "episodes of decomposition and increase of symptoms."  AR 411.  According to the assessment notes, Ms. Xie "exhibits repeated presence of psychotic symptoms" and "has a psychiatric history of recurring substantial functional impairments of symptoms."  AR 412.  The notes indicate that Ms. Xie suffers from paranoid delusions and auditory hallucinations.  AR 410−412.  The report further states that Ms. Xie has "paranoid thinking" and "fears of people harming her."  AR 412.  Using the DSM-IV, Dr. Harris diagnosed Ms. Xie with psychosis, HIV, and having moderate physical issues.  AR 411.  Dr. Harris prescribed Ms. Xie Risperdal for her psychosis.  *Id.*

Ms. Xie returned to PTW several times between January 13, 2012 and May 10, 2012.  AR 403.  Dr. Harris completed mental state assessments for each of her visits, which occurred on January 13, 2012, February 17, 2012, March 16, 2012, April 11, 2012, and May 10, 2012.  AR 394, 397, 399, 401, 403.  In the January 13, 2012 mental state assessment, Ms. Xie reported feeling the same, and complained of feeling weak, dizzy, and hearing noises in her head.  *Id.*

Specifically, she told Dr. Harris that the upstairs neighbors continued to push needles into her head and body. *Id.* Dr. Harris noted that Ms. Xie was "still delusional" and increased her dosage of Risperdal. AR 403, 406. Ms. Xie returned to PTW on February 17, 2012, and Dr. Harris noted that Ms. Xie told him that was reluctant to take more than one pill daily. AR 401. According to the March 16, 2012 assessment notes taken by Dr. Harris, Ms. Xie continued to report hearing noises in her head. AR 400. Dr. Harris's April 11, 2012 assessment notes state that Ms. Xie "will not take multiple pills." AR 397. At each assessment, Dr. Harris continued Ms. Xie's Risperdal prescription and on May 10, 2012 he also prescribed her Zoloft, an anti-depressant. AR 396.

### 6. Highland Hospital Emergency Room Visit

On September 18, 2012, Ms. Xie went to the Highland Hospital Emergency Room in Alameda because she had heard the hospital had a "special treatment" to stop the noises in her head. AR 414−415. According to the notes taken by the triage nurse, Ms. Xie stated that she "has been hearing a voice or sound on the top of her head for many years" and that "someone used a gun with a needle to inject the voice or sound into her head." AR 414, 416. Ms. Xie told the triage nurse that a doctor in China gave her a medication that made the noise go away, but since she has ran out of the medication, the noise has returned. AR 416. The triage nurse was unable to take Ms. Xie's blood pressure because she refused to take off her jacket or sit still for the test. AR 414, 416.

Ms. Xie was seen by Dr. William Soares, who evaluated her with the help of a Cantonese bedside interpreter. AR 414. Ms. Xie told him, through the interpreter, that she heard a "humming sound" on the top of her head for the past year, but denied hearing voices. *Id.* She explained that she had experienced seven episodes of noises in her head throughout her life, each lasting "only [a] short amount of time" before being resolved. *Id.* Ms. Xie told Dr. Soares that she has been experiencing a continuous, pounding noise in her head for a year or more now. *Id.* Ms. Xie told Dr. Soares that her current psychiatric medications have not helped improve her symptoms and that "nothing makes [them] better or worse." *Id.* Ms. Xie also described two episodes of "passing out" from dizziness in 2011, bilateral hearing decreases, and worsening vision. *Id.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Ms. Xie was uncooperative with the nurse trying to place an IV into her for her CT scan.

2   AR 417.  The nurse asked Dr. Soares whether to place Ms. Xie in restraints.  *Id.*  While her CT

3   scan revealed some abnormalities, Ms. Xie was discharged with a prescription for Meclizine, a

4   medication for vertigo.  AR 415, 420.  Following her examination, Dr. Soares' notes reflect a

5   diagnosis of schizophrenia, HIV, and possible tinnitus.  AR 415.  Shortly thereafter, on October

6   24, 2012, Dr. Wong of Asian Health Services ordered an MRI scan at the Highland Hospital for

7   Ms. Xie to have imaging done of her brain.  AR 490.  When Ms. Xie arrived at the hospital,

8   however, she refused to have the scan done because she was scared that she would die.  AR 491.

9   **D.     The Administrative Hearing**

10  Ms. Xie was represented by Chantal Tien, a non-attorney advocate, at her administrative

11  hearing.  AR 26.  Ms. Xie was asked questions and gave answers through a Cantonese interpreter.

12  AR 25.  At numerous points throughout the hearing, Ms. Tien expressed that she felt that the

13  Cantonese interpreter was not accurately conveying her questions and Ms. Xie's answers.

14  Most of the discussion centered on the onset of Ms. Xie's paranoid symptoms, specifically

15  whether they began prior to September 30, 2006, Ms. Xie's DLI.  However, it is unclear based on

16  Ms. Xie's hearing testimony whether she began hearing voices in 2006 or in 2010.  Ms. Tien

17  asked Ms. Xie several questions aimed at ascertaining the onset date of her symptoms.  Ms. Xie

18  was unable to answer most of her questions directly, however, or responded in a confusing or

19  contradictory manner.  At several points in the hearing, the ALJ took over the questioning to move

20  matters along.

21  Ms. Xie was asked to describe when she began to hear voices.  AR 27.  In response to Ms.

22  Tien's first question "when [did] you hear the sounds on your head?" Ms. Xie stated "[b]ecause

23  somebody tried to kill me. So he—that person hit my head and then . . . I hear things."  *Id.*  Later,

24  Ms. Tien asked again when Ms. Xie first began to hear sounds in her head.  Ms. Xie answered,

25  "[s]tart from 2010, I heard voices.  Then I have a headache.  Somebody hit my head . . . ."  AR 31.

26  The ALJ asked when it was that someone hit her on the head, and Ms. Xie responded September

27  2010.  *Id.*

28  The ALJ then asked Ms. Xie to elaborate on her earlier statement about somebody trying

14

United States District Court
Northern District of California

to kill her.  Ms. Xie stated "[t]he person live upstair" and that "[a]ll of a sudden I have a pain, I feel dizzy and then I feel my head hurts."  AR 32.  She also testified that the neighbor from upstairs used a "[gun]. . . . [a]nd then needle" to hurt her.  *Id.*  With leave to ask leading questions, Ms. Tien asked Ms. Xie if she ever thought someone would hurt her.  AR 35.  Ms. Xie responded yes, and when asked to elaborate, she simply stated that "I just think somebody's going to hurt me."  *Id.*  Ms. Xie testified that the upstairs neighbor is named Tommy and that this neighbor used either a gun, needle, or needle gun to hurt her.  AR 35−36.  In response to a question by the ALJ, Ms. Xie explained that Tommy wants to kill her because she scolded her on one occasion.  AR 36.  Ms. Xie also testified that Tommy has lived upstairs for eight or nine years.  AR 37.

Ms. Xie was initially more responsive to Ms. Tien's question about when Ms. Xie began seeing a therapist, to which Ms. Xie responded "2011."  *Id.*  This question, however, was followed by discussions between Ms. Tien and the ALJ about how Ms. Xie must not remember because the record reflects that Ms. Xie began counseling in 2006.  AR 27−28.  Ms. Tien sought to clarify: "why do you have to go to Asian Health Services and go to Doctor . . . and, also the psychiatrist in 2006 . . . ?"  AR 34.  Ms. Xie answered, "[b]ecause of dizziness.  And, then my whole body ache. And then, I heard voices."  *Id.*  But when Ms. Tien tried to clarify the inconsistency, Ms. Xie stated, "2006 is only dizziness and headache.  In 2010, I heard the voice."  *Id.*  Another discussion followed between Ms. Tien and the ALJ regarding the contents of the record, in which Ms. Tein expressed that in light of the record, Ms. Xie did not have the dates correct.  *Id.*  Later in the hearing, Ms. Xie reiterated that "sounds that [she] heard started 2010, September" and that before that she experienced only the "headache, dizziness and whole body ache."  AR 36.  However, Ms. Xie also answered "[c]orrect" when asked if she saw the psychiatrist back in 2006.  AR 39.

Ms. Xie also discussed her prior work history.  Ms. Xie testified that she last worked in 2006 as a seamstress at "Foothill . . . inside the park."  AR 29.  She also testified that she left that job because she had headaches and felt dizzy such that "[she] couldn't do it."  AR 30.  Ms. Xie stated that the headaches and dizziness kept her from getting along with her co-workers.  *Id.* However, in response to a later question by the ALJ as to the cause of the headaches, Ms. Xie testified that "[she] heard noise from [her] head."  AR 33.  When the ALJ asked "[w]as there

1    anything else going on back in 2006 aside from the headaches and dizziness?"  Ms. Xie responded

2    "just the headaches and dizziness."  *Id.*

3          Ms. Tien asked further questions of Ms. Xie regarding whether she took the medicine

4    prescribed to her by the psychiatrist.  Ms. Xie reported that she took this medication.  AR 42.

5    Specifically, when asked by Ms. Tien, "[i]f you take it . . . why [do] the medical records show[]

6    that you're not complying with the medication?" Ms. Xie stated "I took the medication."  *Id.*

7    However, Ms. Xie then admitted that she switched back and forth between the prescribed

8    medications and "older medication like Chinese herbs."  AR 43.  Ms. Xie explained that she

9    switched because she "understand[s] Chinese medicine better than western medicine."  *Id.*  This

10   line of questioning ended when Ms. Tien explained to Ms. Xie that she wanted to understand why

11   the medical records stated that Ms. Xie did not take the medicine prescribed.  *Id.*  Ms. Xie

12   answered only that she "took the medication."  *Id.*

13         The hearing also included the testimony of Thomas Linvill, a Vocational Expert.  Mr.

14   Linvill testified that work as a sewing machine operator (DOT 786.682−054) is classified as light

15   work.  AR 40.  He also testified that work as a bag machine operator (DOT 649.685−014) is

16   classified as medium work.  AR 41.  Ms. Tien asked no questions of Mr. Linvill.

17         The hearing ended with a closing argument by Ms. Tien.  AR 44−46.

18         **E.    The ALJ's Analysis and Findings of Fact**

19               **1.   Legal Standard for Determination of Disability**

20                     a.   Five−Step Analysis

21         Disability insurance benefits are available under the Social Security Act when an eligible

22   claimant is unable "to engage in any substantial gainful activity by reason of any medically

23   determinable physical or mental impairment . . . which has lasted or can be expected to last for a

24   continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. §

25   423(a)(1).  A claimant is only found disabled if his physical or mental impairments are of such

26   severity that he is not only unable to do his previous work but also "cannot, considering his age,

27   education, and work experience, engage in any other kind of substantial gainful work which exists

28   in the national economy."  42 U.S.C. § 423(d)(2)(A).  The claimant bears the burden of proof in

United States District Court
Northern District of California

16

1    establishing a disability. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), *cert. denied*, 519 U.S. 881

2    (1996).

3        The Commissioner has established a sequential five-part evaluation process to determine

4    whether a claimant is disabled under the Social Security Act. 20 C.F.R. § 404.1520(a).  At Step

5    One, the Commissioner considers whether the claimant is engaged in "substantial gainful

6    activity."  20 C.F.R. § 404.1520(a)(4)(I).  If she is, the Commissioner finds that the claimant is not

7    disabled, and the evaluation stops.  If the claimant is not engaged in substantial gainful activity,

8    the Commissioner proceeds to Step Two and considers whether the claimant has "a severe

9    medically determinable physical or mental impairment," or combination of such impairments,

10   which meets the duration requirement in 20 C.F.R. § 404.1509.  An impairment is severe if it

11   "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20

12   C.F.R. § 404.1520(c).  If the claimant does not have a severe impairment, disability benefits are

13   denied at this step.  If it is determined that one or more impairments are severe, the Commissioner

14   will next perform Step Three of the analysis, comparing the medical severity of the claimant's

15   impairments to a compiled listing of impairments that the Commissioner has found to be

16   disabling.  20 C.F.R. § 404.1520(a)(4)(iii).  If one or a combination of the claimant's impairments

17   meet or equal a listed impairment, the claimant is found to be disabled.  Otherwise, the

18   Commissioner proceeds to Step Four and considers the claimant's residual functional capacity

19   ("RFC") in light of her impairments and whether she can perform past relevant work.  20 C.F.R. §

20   404.1520(a)(4)(iv); 20 C.F.R. § 404.1560(b) (defining past relevant work as "work . . . done

21   within the past 15 years, that was substantial gainful activity, and that lasted long enough for you

22   to learn to do it").  If the claimant can still perform past relevant work, she is found not to be

23   disabled.  If the claimant cannot perform past relevant work, the Commissioner proceeds to the

24   fifth and final step of the analysis.  20 C.F.R. § 404.1520(a)(4)(v).  At Step Five, the burden shifts

25   to the Commissioner to show that the claimant, in light of her impairments, age, education, and

26   work experience, can perform other jobs in the national economy.  *Johnson v. Chater*, 108 F.3d

27   178, 180 (9th Cir. 1997).  A claimant who is able to perform other jobs that are available in

28   significant numbers in the national economy is not considered disabled, and will not receive

United States District Court
Northern District of California

17

disability benefits.  20 C.F.R. § 404.1520(f).  Conversely, where there are no jobs available in significant numbers in the national economy that the claimant can perform, the claimant is found to be disabled.  *Id.*

### b.  Analysis of Mental Impairment

Where there is evidence of a mental impairment that allegedly prevents a claimant from working, the Social Security Administration has supplemented the five-step sequential evaluation process with additional regulations to assist the ALJ in determining the severity of the mental impairment.  *Clayton v. Astrue*, 2011 WL 997144, at *3 (E.D. Cal. Mar. 17, 2011) (citing 20 C.F.R. §§ 404.1520a, 416.920a).  These regulations provide a method for evaluating a claimant's pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable mental impairment.  20 C.F.R. § 404.1520a(a).  In conducting this inquiry, the ALJ must consider all relevant and available clinical signs and laboratory findings, the effects of the claimant's symptoms, and how the claimant's functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment. 20 C.F.R. § 404.1520a(c)(1).  The ALJ must then assess the degree of the claimant's functional limitations based on the individual's impairments.  20 C.F.R. § 404.1520a(c)(2).

Although analysis under 20 C.F.R. § 404.1520a includes an assessment of the individual's limitations and restrictions, this is not a residual functional capacity assessment but rather a component of analyzing the severity of mental impairments at Steps Two and Three of the sequential evaluation process.  SSR 96-8p.  The mental residual functional capacity assessment used at Steps Four and Five requires a more detailed assessment in which the ALJ must address the various functions contained in the broad categories found in Paragraph B of the adult mental disorders listed in 12.00 of the Listing of Impairments.  *Id.*

### 2.  The ALJ's Five-Step Analysis

At Step One, the ALJ found that Ms. Xie did not engage in substantial gainful activity from March 1, 2006, the alleged onset date, through September 30, 2006, her DLI.   AR 14.

At Step Two, the ALJ found that Ms. Xie did not have a severe impairment or combination of impairments that significantly limited her ability to perform basic work-related activity for

United States District Court
Northern District of California

18

1    twelve consecutive months, and therefore concluded that Ms. Xie was not disabled at the date of

2    her DLI.  AR 12, 14, 17.

3         Beginning the Step Two analysis, the ALJ found that Ms. Xie had an underlying medically

4    determinable physical or mental impairment that could have been reasonably expected to produce

5    her alleged symptoms.  AR 15.  The ALJ all but admitted that Ms. Xie currently suffers from a

6    severe mental impairment, stating that "claimant's presentation at the hearing and substantial

7    treatment notes from 2010 and 2011 indicate that she may well currently suffer debilitating

8    symptoms of psychosis."  AR 16.

9         Continuing with Step Two, however, the ALJ found that the evidence in the record failed

10   to establish the "regulatory requirements" for the severity and duration of Ms. Xie's mental

11   impairments, finding that the "medical evidence [was] simply insufficient to enable an evaluation

12   of the severity of the claimant's impairment prior to the DLI (9/30/06)" and that "the medical

13   evidence [was] insufficient to establish a continuous 12-month longitudinal history within the

14   relevant period."  AR 16.  According to the ALJ, the record "contain[ed] scant evidence of mental

15   impairment prior to September 2006."  *Id*.

16        First, the ALJ did not find credible Ms. Xie's statements made regarding the intensity,

17   persistence, and limiting effects of her symptoms.  *Id*.  The ALJ states that Ms. Xie's testimony at

18   the administrative hearing was vague, and in particular relies on the fact that Ms. Xie stated more

19   than once in her testimony that her auditory hallucinations began in 2010, four years after her

20   September 30, 2006 DLI.  *Id*.

21        Second, the ALJ points to the fact that there is only one medical report included in the

22   record dated prior to Ms. Xie's DLI indicating that she suffered from psychological impairment −

23   the July 2006 notes from Dr. Huang at AHS in which Ms. Xie reports having psychotic symptoms

24   and is prescribed Haldol.  *Id*.; AR 355.  The ALJ cites the subsequent October and November

25   2006 AHS notes taken by Dr. Suzuki, which reference Ms. Xie's psychosis diagnosis, ongoing

26   Haldol treatment, and her continuing paranoid symptoms.  AR 16, 352−53, 355.  The ALJ also

27   points to Dr. Ta's treatment notes, which began in December 2006, in which Dr. Ta diagnosed Ms.

28   Xie with psychotic disorder.  AR 16, 493.  According to the ALJ, this medical evidence is "simply

insufficient" to enable an evaluation of the severity of Ms. Xie's impairment prior to her September 2006 DLI or to establish a continuous twelve month longitudinal history within the relevant period necessary to satisfy the regulatory duration requirement.  AR 16.

Third, the ALJ did not find credible the medical statements made by Dr. Wong, Dr. Kay, and social worker Flora Chu or the third party statements of Ms. Betty Chieng, because the ALJ found that their statements about Ms. Xie's impairments were not consistent with the "minimal" medical evidence available for the period prior to September 30, 2006.  AR 16.  According to the ALJ, the medical source statements were not credible because the earliest assessment was made in May 2011, and none of these providers treated Ms. Xie prior to 2010.  *Id.*  The ALJ did not find credible Ms. Chieng's statements for similar reasons, namely that the record during the relevant period contained what the ALJ considered to be insufficient evidence to support her statements. *Id.*  Particularly, the ALJ did not find that Ms. Xie's termination from the plastic bag factory to be sufficient, without more, to establish that she suffered from a disabling impairment prior to her DLI.  AR 17.

For the reasons set forth above, the ALJ found that Ms. Xie failed to demonstrate, at the time of her DLI, that she was suffering from a severe medically determinable impairment that had lasted or could be reasonably expected to last a continuous period of twelve months or more, and therefore did not disturb the determination that Ms. Xie is not disabled under the Social Security Act.  AR 17.  Because the analysis terminated with the decision at Step Two, the ALJ did not proceed to Steps Three through Five.

### F.    Contentions of the Parties

In Ms. Xie's summary judgment motion ("Mot."), she asks the Court to reverse the Commissioner's denial of disability benefits, or alternatively to remand for further proceedings, on the following grounds:  (1) the ALJ erred in finding that Ms. Xie's psychosis did not cause more than minimal impairments to her functioning prior to her DLI, September 30, 2006, as suffices to satisfy the threshold analysis at Step Two; (2) the ALJ erred in her evaluation of Ms. Xie's credibility and of third party statements by failing to consider the entire case record; (3) the ALJ's finding that Ms. Xie was not disabled prior to her DLI was not supported by substantial evidence;

United States District Court
Northern District of California

1  and (4) the ALJ committed legal error and abused her discretion in failing to provide a medical

2  expert and a supplemental hearing to determine the onset date of Ms. Xie's disability, as required

3  by SSR 83-20 where the medical record is insufficient to infer the onset date of a claimant's

4  disability.  Mot. at 11−19.

5       The Commissioner contends that the record contained insufficient evidence to support an

6  evaluation of severity or continuity necessary to find that Ms. Xie had a severe medically

7  determinable impairment that had lasted or could reasonably be expected to last twelve months or

8  more.  Opp'n at 5.  Particularly, the Commissioner contends that although treatment notes prior to

9  Ms. Xie's DLI reflect a diagnosis of psychosis, the treating doctor did not evaluate or discuss the

10 severity of Ms. Xie's mental impairment other than to note that she was non-compliant with her

11 medication.  *Id.*  Further, the Commissioner maintains that there is substantial evidence supporting

12 the ALJ's decision to discount the third party statements made by Ms. Xie's medical providers and

13 her daughter, as well as the ALJ's finding that Ms. Xie's statements concerning the extent of her

14 symptoms were not credible, because the statements made by Ms. Xie, her daughter, and her

15 providers are unsupported by the medical record.  *Id.* at 5−7.  The Commissioner further maintains

16 that the ALJ's finding that Ms. Xie failed to meet her burden of establishing that she was under a

17 disability during the relevant period was supported by substantial evidence.  *Id.* at 8−9.  Lastly, the

18 Commissioner contends that the ALJ was not required to obtain testimony from a medical expert

19 in order to determine the onset date of Ms. Xie's disability.  *Id.* at 9.  In particular, the

20 Commissioner argues that medical experts are only required when the ALJ makes a preliminary

21 determination that the claimant is disabled.  *Id.*  In this case, however, since the ALJ found that

22 Ms. Xie was not disabled, no medical expert was required to determine the onset date of her

23 disability.  *Id.*

24 **III.   ANALYSIS**

25     **A.   Legal Standard Under 42 U.S.C. § 405(g)**

26       When asked to review the Commissioner's decision, the Court takes as conclusive any

27 findings of the Commissioner which are free from legal error and supported by "substantial

28 evidence."  42 U.S.C. § 405(g).   Substantial evidence is "such evidence as a reasonable mind

1   might accept as adequate to support a conclusion," and it must be based on the record as a whole.

2   *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial evidence means "more than a mere

3   scintilla," *id.*, but "less than a preponderance."  *Desrosiers v. Sec'y of Health and Human Servs.*,

4   846 F.2d 573, 576 (9th Cir. 1988).   Even if the Commissioner's findings are supported by

5   substantial evidence, they should be set aside if proper legal standards were not applied when

6   weighing the evidence and in reaching a decision.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir.

7   1978).  In reviewing the record, the Court must consider both the evidence that supports and

8   detracts from the Commissioner's conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir.

9   1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

10        If the Court identifies defects in the administrative proceeding or the ALJ's conclusions,

11   the Court may remand for further proceedings or for a calculation of benefits. *See Garrison v.*

12   *Colvin*, 759 F.3d 995, 1019−21 (9th Cir. 2014).

### B.   The ALJ's Finding at Step Two that Plaintiff did not have a Severe Impairment as of September 30, 2006 is Not Supported by Substantial Evidence

In finding that Plaintiff did not have a "severe mental impairment" at Step Two, the ALJ

appears to have applied a more stringent legal standard than is applicable at this stage of the 5-step

analysis.  *See Edlund v. Massanari*, 253 F.3d 1152, 1158-59 (th Cir. 2001).   The Step Two

inquiry is "a de minimis screening device to dispose of groundless claims."  *Smolen v. Chater*, 80

F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153-54 (1987)).  As noted

above, the ALJ essentially acknowledged that Plaintiff had a severe mental impairment sometime

after September 30, 2006.  Her conclusion that Plaintiff did not meet the Step Two requirement is

based on her finding that there was insufficient evidence of the severity of Plaintiff's condition as

of the September 30, 2006.  The reasoning supporting that conclusion includes several legal errors.

First, the ALJ notes that there was only "a single medical reference to psychological

impairment prior to the DLI," namely, that "the claimant was reported to have psychotic

symptoms in July 2006, and was started on Haldol."  AR 16 (citing Ex. 8F/46).  The ALJ

acknowledges that examining physicians agreed with the diagnosis in treatment notes from

October 19, 2006 and November 30, 2006.  She does not, however, address the comments that

United States District Court
Northern District of California

Plaintiff was "paranoid" and "hallucinating," AR 352, or that she "still thinks people are after her." AR 350.  Given that these observations were made by examining physicians only weeks after Plaintiff's September 30, 2006 DLI, these opinions were relevant to the severity of Plaintiff's symptoms during the covered period and should have been addressed.  *See Flaten v. Sec'y of Health & Human Servs.,* 44 F.3d 1453, 1461 (9th Cir. 1995) ("The claimant is eligible for coverage only if the current period of disability extends back continuously to an onset date prior to the expiration of insured status. The claimant may establish such continuous disabling severity by means of a retrospective diagnosis");  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995) (in order to reject the uncontradicted opinion of an examining physician, an ALJ must offer clear and convincing reasons);  *Hartman v. Bowen*, 636 F. Supp. 129, 134 (N.D. Cal. 1986) (report of examining physician should not be rejected "due to absence of substantial documentation, unless there are other reasons to question the diagnostic technique" and therefore ALJ erred in rejecting doctor's statements without offering any reasons for questioning doctor's diagnostic technique).

Even more troubling is the ALJ's mischaracterization of Plaintiff's testimony and her arbitrary decision to credit some statements over others to determine the severity of Plaintiff's symptoms as of the DLI.  In particular, the ALJ states that Plaintiff testified she left her job in 2006 because "she always felt dizzy and had headaches."  AR 15.  The ALJ does not mention in her decision, however, that Plaintiff also testified, when asked for the *cause* of her headaches, that she "heard noise from the head." AR 33.   Rather, the ALJ apparently credited a subsequent, contradictory statement by Plaintiff that she began to hear voices in 2010.  AR 34.

In determining whether to credit or reject a claimant's testimony about the severity of her symptoms, an ALJ is required to offer specific reasons that are clear and convincing unless there is a finding of malingering.  *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012).  Where, as here, there was no finding of malingering and the claimant's testimony was confused and internally inconsistent as to dates (as acknowledged by the ALJ on the record, *see* AR 34), the ALJ had an obligation to offer clear and convincing reasons for choosing to credit Plaintiff's testimony that she did not hear voices until 2010 while rejecting testimony that she had to leave her job in 2006 due to auditory hallucinations.  Given that contemporaneous medical notes from July 2006 (*before*

23

United States District Court
Northern District of California

1    the DLI) reflect that Plaintiff's son took her to be seen at Asian Health Services because she was

2    hallucinating and exhibiting a "paranoid type" "mental problem," AR 355, the ALJ's failure to

3    offer any reasons for rejecting Plaintiff's testimony that she was having auditory hallucinations in

4    2006 was a serious error going to a key issue in the case.

5         Third, the ALJ did not apply the appropriate standard when evaluating the statements of

6    Plaintiff's daughter, Betty Xie.  As discussed above, Betty Xie's Third-Party Function Reports

7    reflected that Plaintiff suffered from a serious psychological impairment - that Plaintiff put tin

8    cans over her body because she thought people were trying to kill her, that her speech was

9    delusional, that she was "too paranoid to get along with others" and that she had been fired from

10   her job due to paranoid behavior.  AR 192-198.  "Lay testimony as to a claimant's symptoms is

11   competent evidence which the Secretary must take into account, unless he expressly determines to

12   disregard such testimony, in which case 'he must give reasons that are germane to each witness.'"

13   *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (quoting *Dodrill v. Shalala*, 12 F.3d 915,

14   919 (9th Cir.1993)).  The ALJ stated generally that she gave "little weight" to the statements of

15   Plaintiff's daughter because "the record during the relevant period contains insufficient evidence

16   to support the statements."  AR 16.  She did not give any specific reasons, however, for

17   concluding that the testimony offered by Plaintiff's daughter as to Plaintiff's symptoms - which

18   was entirely consistent with the observations of the doctors who examined Plaintiff at the Asian

19   Health Center in July, October and November 2006 - was not credible.

20        Finally, the ALJ did not fulfill her duty to develop the record as to Plaintiff's onset date.

21   In SSR 83-20, the Social Security Administration recognized that "[i]n many claims, the onset

22   date is critical; it may affect the period for which the individual can be paid and may even be

23   determinative of whether the individual is entitled to or eligible for any benefits."  SSR 83-20.  To

24   determine the onset date, the ALJ must consider "the individual's allegation, the work history, and

25   the medical evidence."  *Id*.  The SSA explains, "[d]etermining the proper onset date is particularly

26   difficult, when, for example, the alleged onset and the date last worked are far in the past and

27   adequate medical records are not available. In such cases, it will be necessary to infer the onset

28   date from the medical and other evidence that describe the history and symptomatology of the

disease process." *Id*.   Under SSR 83-20, "[a]t the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred" and "if there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made." *Id*.   The Ninth Circuit has held that "in this context the word 'should' means 'must.'"   *Armstrong v. Comm'r of Soc. Sec. Admin*., 160 F.3d 587, 589 (9th Cir. 1998).   Further, the duty to develop the record does not end with medical evidence, as SSR 83-20 explains:

> If reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in file and additional relevant medical evidence is not available, it may be necessary to explore other sources of documentation. Information may be obtained from family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition.

*Id*. Here, the ALJ failed to call a medical expert and did not seek additional information from other sources as to Plaintiff's symptoms prior to the onset date or the reasons she was terminated from her job in March 2006, simply pointing to insufficient medical evidence as a basis for finding that Plaintiff's impairment was non-severe as of the DLI.

The United States argues that SSR 83-20 does not apply because the ALJ did not make a determination that Plaintiff was disabled at any point.  Docket No. 20 at 9. This argument flies in the face of the well-established rule that the ALJ has a duty to develop the record – a duty that is heightened when the claimant suffers from a mental impairment and therefore may not be able to protect her own interests.  As Judge Chen explained in *Hilliard v. Barnhart*:

> "[t]he ALJ in a social security case has an independent 'duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" *Tonapetyan v. Halter*, 242 F.3d 1144, 1151 (9th Cir.2001) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir.1996)). The Ninth Circuit has recently reiterated that "the ALJ should not be 'mere umpire' during disability proceedings," but must "'scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.'" *Widmark v. Barnhart*, 454 F.3d 1063, 2006 DJDAR 9741, 9443 (9th Cir. 2006). "Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to 'conduct an appropriate inquiry.'" *Id*. (citing *Smolen*, 80 F.3d at 1288). "This duty extends to the represented as well as to the

25

1

2

3

4

> unrepresented claimant." *Tonapetyan* at 1151. "The ALJ's duty to
> develop the record fully is also heightened where the claimant may
> be mentally ill and thus unable to protect [his] own interests." *Id.*
> (citing *Higbee v. Sullivan*, 975 F.2d 558, 562 (9th Cir.1992));
> *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir.1991) ("In cases of
> mental impairments, this duty [to develop the record] is especially
> important.").

5

6

7

8

9

10

11

12

*Hilliard v. Barnhart*, 442 F. Supp. 2d 813, 817 (N.D. Cal. 2006). Where, as here, the ALJ all but

conceded that Plaintiff suffered from a severe mental impairment sometime *after* the DLI, she may

not evade her duty to develop the record as to the onset date simply by failing to formally address

the question of whether Plaintiff  was at any point disabled.  The ALJ's error was particularly

egregious in light of the fact that the medical evidence in the record as to Plaintiff's symptoms and

the third party description of her symptoms by Plaintiff's daughter were consistent in pointing to

the conclusion that Plaintiff suffered from a severe impairment  and that she may well have

exhibited severe symptoms as of the DLI.

13

14

15

> For all of these reasons, the ALJ's finding at Step Two that Plaintiff's impairment was

non-severe as of the DLI is not supported by substantial evidence.  Therefore, the decision of the

Commissioner must be reversed.

16

### C.    Appropriate Remedy

17

18

19

20

21

22

23

24

25

26

 "Generally when a court . . . reverses an administrative determination, 'the proper course,

except in rare circumstances, is to remand to the agency for additional investigation or

explanation.'" *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted); *Moisa

v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004). Here, the court concludes that it is appropriate to

remand for further proceedings because the ALJ did not complete the five-step disability analysis,

committed numerous legal errors at Step Two and failed to develop the record as to Plaintiff's

onset date.  *See Edlund v. Massanari*, 253 F.3d 1152, 1160 (9th Cir. 2001), as amended on reh'g

(Aug. 9, 2001) (reversing and remanding for further proceedings where ALJ's conclusion that

claimant did not have severe mental impairment was not supported by substantial evidence);

*Tagger v. Astrue*, 536 F. Supp. 2d 1170, 1181 (C.D. Cal. 2008) (same).

27

## IV.   CONCLUSION

28

> For the reasons stated above, Plaintiff's motion for summary judgment is GRANTED;

United States District Court
Northern District of California

Defendant's motion for summary judgment is DENIED.  The Court reverses the decision of the ALJ and remands for further proceedings to address the deficiencies identified above.

**IT IS SO ORDERED.**

Dated:  September 18, 2015

_____
JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California